# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| OCIE WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:06-CV-00390** |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Ocie White appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[2] (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be REVERSED and REMANDED to the Commissioner for

further proceedings in accordance with this Opinion.

## I.  PROCEDURAL HISTORY

White applied for DIB and SSI on December 4, 2003, alleging that he became disabled as

of May 12, 2001. (Tr. 109-13.)  The Commissioner denied his application initially and upon

reconsideration, and White requested an administrative hearing. (Tr. 48-49, 51-54, 63-78.)  On

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is
automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P.
25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

December 9, 2005, Administrative Law Judge (ALJ) Frederick McGrath held a hearing, at which White, who was represented by counsel, his wife, and a vocational expert testified. (Tr. 1095-1122.)  On January 12, 2006, the ALJ rendered an unfavorable decision to White, concluding that he was not disabled despite the limitations caused by his impairments because he could perform his past relevant work. (Tr. 27-36.)  The Appeals Council then denied White's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.)  White filed a complaint with this Court on December 8, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  WHITE'S ARGUMENTS

White alleges four flaws with the Commissioner's final decision.  Specifically, White claims that the ALJ improperly evaluated: (1) the credibility of his testimony of debilitating limitations; (2) the opinion of Dr. Zolman, his treating physiatrist; (3) the opinion of Dr. Coats, his treating family practitioner, and (4) whether White met Listing 12.05C, the listing for mental retardation. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 17-22.)  Because a remand of the Commissioner's decision is warranted under the first two arguments, White's remaining two arguments will not be addressed in this Opinion.

## III.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, White was fifty-one years old, had a tenth grade

---

[3] The administrative record in this case is voluminous (1122 pages), and the parties' disputes involve only portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

education,[4] and possessed work experience as a janitor, cleaner (housekeeping), cashier, press

punch operator, and survey interviewer. (Tr. 237, 1098.)  White claims that he is disabled due to

degenerative disk disease at C5-C6, myofascial neck pain, disk herniation at C5-C6, hepatitis C,

insulin dependent diabetes mellitus, hypertension, sacroiliits of the hip joint, depression, right-

sided brain infarction, and low vision. (Opening Br. at 2.)

At the hearing, White testified that he lives in a home with his wife, who works the day

shift full-time outside the home, and his eighteen-year-old stepson. (Tr. 1099, 1114, 1117.)

White stated that he requires help with basically "everything [he] do[es]," including dressing,

bathing, and cutting up his meat. (Tr. 1106-07.)  He reported that he does "[b]asically nothing"

in a typical day, alternating between "sit[ting] around for a while" and "lay[ing] down for a

while." (Tr. 1111.)  White further explained that he cannot not even play with his grandchildren.

(*Id.*)          When asked how much he could lift and carry, White stated that lifting a gallon of

milk is "hard" for him. (Tr. 1103.)  He further stated that he could stand for "[m]aybe an hour,"

that he could sit for twenty minutes, and that he could walk for "about half a block." (Tr. 1103-

04.)  He also explained that he has "a lot of weakness" and numbness in his hands, stating that a

cup or glass will "just fall out" and that he has difficulty handling utensils. (Tr. 1105-06.)

White further testified that he experiences a "[b]urning, throbbing" pain from the middle

of his neck all the down to the bottom of his back and a pain that feels "[l]ike pins" in his legs.

(Tr. 1107-08.)  He stated that the pain is "so constant" that it makes him "nauseated." (*Id.*)  To

---

[4] Though White represented in his disability application that he had obtained his GED, he stated at the hearing that he had not. (*Compare* Tr. 191, 242, *with* Tr. 1098.)  Similarly, as will be articulated *infra*, Dr. Von Bargen documented that White attended special education classes; however, White represented on his application that he did not. (*Compare* Tr. 538, 544, *with* Tr. 191, 242.)  Thus, conflicting information exists in the record concerning White's educational background.

help relieve his pain, White reported that he has tried medication, including Methadone, and therapy but that they have "[n]ot really" helped. (Tr. 1108-09.)  He clarified, however, that "the only time that [he] can possibly maybe get a little sleep is when [he's] taking the medicine." (Tr. 1109.)  White emphasized that he does not like to take the medication because it makes him feel "incapacitated," explaining that he cannot function after he takes it because he falls asleep for several hours. (Tr. 1109-10.)  White's wife corroborated this testimony, observing that when White takes his medication "he's there but he's not there." (Tr. 1116.)

White also reported that he has experienced depression, which causes him to cry constantly and at times have suicidal thoughts. (Tr. 1112.)  He elaborated that his suicidal thoughts commenced when he was no longer able to take care of his family. (Tr. 1113.)  In addition, White's wife explained that once White becomes frustrated because of his disabilities, "he just cuts himself off from everybody," including her and the children. (*Id*.)  She further stated that he experiences "good days" and "bad days," with his bad days occurring two or three times a week. (Tr. 1115-16.)  She explained that White's frustration caused her to move out at one point but that they got back together "because he can't do for himself" and is "afraid to live alone." (Tr. 1116-17.)

### B.  Summary of the Relevant Medical Evidence

White visited the emergency room at St. Joe Medical Center three times in 2001, complaining of left shoulder and neck pain. (Tr. 1044-50.)  On November 21, 2001, he was evaluated by Dr. Matthew Nofziger at the St. Joe Medical Center Orthopedic Clinic for his complaints of pain. (Tr. 1031.)  Dr. Nofziger noted that White's pain was located in the posterior aspect of his neck and in his left trapezial muscle and that he had no radicular symptoms,

numbness or tingling in his upper extremities, or weakness in his hands; upon examination, White's neck range of motion was nearly full though he did have some discomfort in the end range. (*Id.*)  Dr. Nofziger observed that White's x-rays revealed degenerative changes at C5-C6 with mild disk space narrowing and anterior osteophyte formation. (*Id.*)  He assigned White a diagnosis of degenerative disk disease, C5-C6, with myofascial neck pain, noting that White would be prone to experience some intermittent neck pain but that there were no "surgical-type problems." (*Id.*)

In May 2002, White was evaluated by Dr. Rami Akel at the request of the Social Security Administration. (Tr. 1018-20.)  White stated that he had hurt his back at work during the previous month and that he currently experienced sharp pain in his lower back that radiated to both lower extremities. (*Id.*)  On physical examination, Dr. Akel noted that White limped on his right side due to back pain, had tenderness in the thoracic through lumbar spine, had limited straight leg raising, and could not walk on heels or toes or tandem walk due to pain. (*Id.*)  He further observed that White had limited range of motion in his dorsolumbar spine and that his neurological examination was normal. (*Id.*)  He also noted that White's fine finger manipulation was normal but that his grip strength was twenty-five pounds on the right and fifteen pounds on the left. (*Id.*)  Dr. Akel concluded that White's complaints did not seem to affect his activities of daily living. (*Id.*)

That same month, White visited Dr. Kevin Rahn, an orthopaedic surgeon, for complaints of low back and leg pain that he rated as a "ten" on a scale of one to ten. (Tr. 797-98.)  Dr. Rahn noted that White had a weak extensor hallucis longus on the right (4/5) but otherwise that his strength was normal. (*Id.*)  He further observed that White's sensation was decreased in the L5

distribution of his right leg and that the range of motion of his hips and back was eighty percent less than normal because of his low back pain and bilateral leg pain. (*Id.*)  His straight leg raising test was negative. (*Id.*)  Dr. Rahn stated that White's x-rays showed that his lumbar spine was "relatively normal appearing with minimal degenerative changes"; however, he recommended that White obtain an MRI. (*Id.*)  Dr. Rahn opined that he was not really clear whether the cause of White's pain was myofascial, axial, or disk-related. (*Id.*)  He then limited White to "seated work only" and to lifting no more than three pounds, referring him to Dr. Mark Zolman, a physiatrist, for a consultation. (Tr. 1007.)

On June 17, 2002, Dr. B. Whitley, a state agency physician, reviewed White's record and opined that White could occasionally lift fifty pounds; frequently lift twenty-five pounds; sit for six hours in an eight-hour work day; stand/walk for six hours in an eight-hour work day; and frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 1010-17.)  Dr. Whitley's opinion was later affirmed by a second state agency physician. (*Id.*)

Also in June 2002, White underwent an evaluation by Dr. Zolman. (Tr. 785-89.)  White described his pain as a deep, aching-type pain that was constant and that his symptoms were aggravated by standing and somewhat relieved by sitting. (*Id.*)  He rated his pain at its worst as a "ten" and at its best as a "seven." (*Id.*)  On physical examination, his gait was slow, and he had pain when standing on his heels and toes. (*Id.*)  His range of motion was severely limited by pain, primarily with flexion; there was tenderness in the lumbar spine, including to light touch; his sensation was intact in the lower extremities; and his strength was 4/5 in the lower extremities. (*Id.*)  Dr. Zolman noted that White's MRI showed some mild disk protrusions at L4-5 and L5-S1 but that there was no significant stenosis. (*Id.*)  He assigned White a diagnosis of

lumbar strain and degenerative disk disease, prescribed him medication, and recommended that he participate in a work conditioning program and functional capacity evaluation ("FCE"). (*Id.*) He further opined that White could perform work with a sit to stand option that did not require him to lift more than ten to fifteen pounds or more than occasionally bend and twist. (*Id.*)

White returned to Dr. Zolman on July 3, 2002, reporting that his symptoms were about the same. (Tr. 780-83.)  On physical examination, White was able to transition independently from sitting to standing and on and off the exam table; his gait was slow. (*Id.*)  His range of motion in his lumbar spine was severely limited, there was tenderness in his lumbar spine even to light touch, and his strength was 4/5 in the lower extremities. (*Id.*)  He again recommended that White participate in an FCE to determine permanent restrictions. (*Id.*)  White visited Dr. Zolman again in late July, and Dr. Zolman reiterated his recommendation that White submit to an FCE. (Tr. 774-75.)

On August 2, 2002, White underwent an FCE administered by a physical therapist. (Tr. 819-24.)  White complained of pain at a level "ten" on almost every task during the FCE. (*Id.*) The physical therapist concluded that White could occasionally lift three pounds; frequently lift one pound; rarely bend; never squat; and only occasionally sit, stand, or walk. (*Id.*)  The physical therapist documented that White gave "good effort" and that the results of the FCE were valid. (*Id.*)

White visited Dr. Zolman a few days later, reporting that his pain was no better and at times worse. (Tr. 769-71.)  Dr. Zolman's examination revealed that White had limited lumbar motion but full strength, normal reflexes, normal station, no limp, and no muscle spasms. (*Id.*) Dr. Zolman stated that he was "unable to explain why [White's] symptoms continue to be

7

problematic for him," noting that his MRI results were "not particularly remarkable" and that he was not a surgical candidate. (*Id.*)  He opined that White had a zero impairment of the whole person but stated that based upon the FCE White could lift, carry, push, and pull no more than one pound and could only occasionally sit, stand, walk, stoop, bend, and balance. (*Id.*)  He indicated that these restrictions were permanent. (*Id.*)

In September 2002, White visited the emergency room, complaining of back pain after he lifted a chair. (Tr. 929-31.)  He had some lumbar tenderness but otherwise had normal muscle strength, reflexes, and sensation in his lower extremities. (*Id.*)

One month later, White was seen in the emergency room for neck pain after he was involved in a motor vehicle accident. (Tr. 923-25.)  Two days later, he was evaluated by Dr. John Williams, an orthopaedic surgeon. (Tr. 843.)  On physical examination, White's neck was diffusely tender, and he had discomfort when actively moving his neck in any direction. (*Id.*)  Dr. Williams ordered an MRI, the results of which were inconsistent with White's complaints of left arm pain. (*Id.*; *see also* Tr. 388-90, 392, 836-37, 845-46, 856-57, 926.)  Dr. Williams recommended that White undergo physical therapy and a pain management plan. (Tr. 843.)

In December 2002, White was evaluated by Dr. Deborah Coates, a physician specializing in pain management. (Tr. 832.)  He complained of weakness, numbness, and pain at a level "ten" "just about everywhere" that he was superficially touched; however, the examination revealed normal strength and reflexes. (*Id.*)  He told Dr. Coates that the ten Vicodin he was taking each day was not strong enough, even though it was more than what was prescribed. (*Id.*)  Dr. Coates suggested that White receive a steroid injection to help his neck pain but he refused, stating that he did not want to receive "any injections whatsoever." (*Id.*)

In January 2003, White visited the hospital emergency room due to complaints of chronic neck pain. (Tr. 703.)  An examination revealed limited range of motion in his neck but normal range of motion in his upper extremities. (*Id*.)  That same month, White saw Dr. Charles Coats, his family practitioner, on two occasions; these examinations revealed limited range of motion in his neck but normal reflexes, strength, muscle tone, and gait. (Tr. 356-58.)

The next month, White was hospitalized as a result of poor diabetes control. (Tr. 422-27, 680-702.)  He was hospitalized again in March 2003 for a gallbladder problem that required surgery. (Tr. 661-70.)

In August 2003, White again visited the emergency room due to left shoulder pain, stating that he worked at a furniture company and performed "a heavy lifting job." (Tr. 645-46.)  He displayed limited range of motion in his left shoulder but "strong" grip strength, normal sensation, and full range of motion in his wrist and elbow. (*Id*.)  The next month White had "good strong grip strength" and normal reflexes. (Tr. 878.)  In October 2003, White visited the emergency room twice for complaints of neck and shoulder pain. (Tr. 400-01, 613-14, 645.)  Examinations revealed neck spasms but "excellent" grip, biceps, and triceps strength. (Tr. 400-01, 613-14, 619-20.)

In November 2003, White was hospitalized for Vicodin detoxification. (Tr. 867-71.)  He confided to an examining psychiatrist that he was taking excessive amounts of Vicodin and that he was previously addicted to heroin. (*Id*.)  He was assigned a diagnosis of depression. (*Id*.)

In January 2004, White underwent a psychological examination by Barbara Gelder, Ph.D., at the request of the state agency. (Tr. 543-47.)  He complained of depression and anxiety and was tearful during the examination. (*Id*.)  He stated that he had a prescription for an

antidepressant but that he could not afford to fill it. (*Id.*)  He denied any history of drug or alcohol abuse but admitted he was incarcerated twenty years earlier. (*Id.*)  Dr. Gelder observed that White had a flat affect and depressed mood and that he had difficulty with abstract thinking and proverb interpretation; he was, however, able to perform simple mathematical calculations. (*Id.*)  Dr. Gelder assigned White a diagnosis of major depression and rule out average/borderline cognitive functioning, noting that his current Global Assessment of Functioning (GAF) score was 41 and his past GAF was 47.[5] (*Id.*)

In February 2004, White underwent a consultative physical examination by Dr. Michael Holton. (Tr. 534-35.)  Dr. Holton observed that White had a fairly marked increase in low back discomfort with some associated difficulty getting on and off the examination table with the assistance of another person. (*Id.*)  He also demonstrated a slightly broad base gait with mild to moderate slowing; in addition, he displayed limited range of motion, muscle spasms, decreased leg sensation, decreased left thenar eminence sensation, and mildly decreased strength (4/5) in all extremities. (*Id.*)  His grip strength was fifteen pounds in his left hand and twenty pounds in his right hand; he could not pick up coins or manipulate a zipper. (*Id.*)  White refused to perform certain requested ambulatory maneuvers. (*Id.*)  Dr. Holton documented that White's effort was difficult to ascertain on the active range of motion testing and that he appeared to have an exaggerated pain response. (*Id.*)  Dr. Holton recommended that White undergo a psychological evaluation. (*Id.*)

---

[5] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF between forty-one and fifty means an individual experiences serious symptoms (such as suicidal ideation, severe obsessional rituals, or frequent shoplifting) or some a serious impairment in social, occupational, or school functioning (such as no friends or unable to keep a job). *Id.*

The next month, White saw Wayne Von Bargen, Ph.D., for IQ testing at the request of the state agency. (Tr. 538-42.)  Dr. Von Bargen noted that White had attended special education classes and dropped out of school in the eleventh grade but that he had later obtained his GED. (*Id*.)  After undergoing the WAIS-III, White had a verbal IQ of sixty, a performance IQ of fifty-three, and a full scale IQ of fifty-two, which fell within the mild mental retardation range of functioning; Dr. Von Bargen noted that no previous testing data was available for comparison. (*Id*.)  He assigned White a diagnosis of mild mental retardation. (*Id*.)

In April 2004, White sought medical care, stating that he was self-employed in furniture moving and that he had injured his neck and shoulder while carrying a refrigerator. (Tr. 445-46, 479-80.)  An examination revealed neck and trapezious tenderness and limited range of motion in his neck but "good" grip strength and sensation. (Tr. 445-46, 479-80.)

That same month, White underwent a consultative visual examination by Dr. Earl Braunlin, an ophthalmologist. (Tr. 524-28.)  He demonstrated 20/50 visual acuity in both eyes with glasses and 20/40 without glasses. (*Id*.)  Dr. Braunlin noted that White had a visual field defect and stated that bifocals would be helpful; however, he also stated that White's vision was "probably better than recorded." (*Id*.)  Dr. Braunlin opined that White could work "if [he] desires to work." (*Id*.)

In March and April 2004, White visited the emergency room for neck pain and tailbone pain. (Tr. 445-54, 479-84.)

On April 26, 2004, Dr. Roush reviewed White's record on behalf of the state agency and concluded that White could occasionally lift twenty pounds; frequently lift ten pounds; sit for six hours in an eight-hour work day; stand/walk for six hours in an eight hour work day; and

occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 516-23.)  A second state agency physician later affirmed Dr. Roush's opinion. (*Id*.)

The next month, Fred Kladder, Ph.D., reviewed White's record and opined that White's impairments did not meet or equal listing. (Tr. 498-511.)  He further concluded that White had a moderately limited ability to understand, remember and carry out detailed instructions; travel to unfamiliar places or use public transportation; set realistic goals; and complete a normal work day and work week without interruption from psychologically-based symptoms. (*Id*.)  Dr. Kladder further opined that White could perform simple work-like activities despite his limitations. (*Id*.)  A second state agency psychologist later reviewed the record and affirmed Dr. Kladder's opinion. (*Id*.)

In September 2004, White again visited the emergency room, complaining of pain in his left shoulder and clavicle. (Tr. 376-77.)

That same month, White was evaluated by Dr Bhupendra Shah, a neurologist, regarding pain in his left shoulder, neck, and arm. (Tr. 439-40.)  Dr. Shah's examination showed decreased reflexes, limited left shoulder movements, left arm weakness, and left-sided homonymous hemianopia,[6] which raised the concern of a possible stroke. (*Id*.)  He recommended that White undergo an MRI of his head and cervical spine. (*Id*.)

That same day, White visited Dr. John Pierson at the St. Joe Medical Center Orthopaedic Clinic, complaining of pain in his cervical spine that radiated down the left side of his neck into his shoulder and occasional numbness and tingling in his hands. (Tr. 309-10.)  Upon

---

[6] Homonymous heminaopia is the loss of part or all of the left half or right half of both visual fields. *The Merck Manual* 872 (Mark H. Beers, ed., 18th ed. 2006).

examination, Dr. Pierson observed that White had limited range of motion in his neck, a positive

Spurling maneuver[7] on the left, decreased but equal reflexes, normal sensation, and normal

strength in his upper extremities. (*Id.*)  An MRI of White's cervical spine revealed foraminal

stenosis at C3-C4 and degenerative disk disease at C5-C6 with an annular bulge and a focal disk

protrusion, and an MRI of his brain revealed a non-specific white matter defect that was thought

to be an old ischemic or demyelinating insult. (Tr. 396-97, 437-38.)  Dr. Pierson diagnosed

White with left arm radiculitis possibly caused by foraminal stenosis, but also noted that his left

arm symptoms might have been caused by a right-sided stroke. (Tr. 307.)

In October 2004, White returned to Dr. Shah to discuss the results of his MRI. (Tr. 435.)

He noted that there was evidence of right perventricular white matter disease in the MRI of his

brain. (*Id.*)  On examination, White had left-sided homonymous hemianopia, limitations of

movement in his left shoulder, weakness of his left arm, and hypo-reflexia. (*Id.*)  He referred

White to Dr. John Williams for his left shoulder and neck pain and recommended that he

undergo a carotid ultrasound. (*Id.*)

Dr. Williams evaluated White on October 14, 2004, noting that White was in significant

distress. (Tr. 374-75.)  More particularly, White had a slight right lateral gaze and sat favoring

his right side. (*Id.*)  His examination revealed a positive Spurling's sign on the left, decreased left

arm sensation, and reduced strength in the left biceps and triceps, but normal strength in his left

wrist and normal upper extremity reflexes. (*Id.*)  White also had a positive straight leg raising

test on the left, decreased strength in his left leg muscles, and decreased ankle reflexes but

---

[7] A positive Spurling's sign is reproduction of radicular pain upon extension and lateral rotation of the neck and suggests cervical disk disease. *The Merck Manual* 325 (Mark H. Beers, ed., 18th ed. 2006).

normal knee reflexes. (*Id*.)  Dr. Williams concluded that White's "MRI findings just do not correlate with his symptoms" and recommended that he obtain a pain management consultation. (*Id*.)

About two weeks later, White was evaluated by Dr. Shantanu Kulkarni, a pain specialist. (Tr. 370-71.)  White told Dr. Kulkarni that his symptoms were getting worse, that his pain level was a "ten," and that he had been working part-time at International Harvester. (*Id*.)  On physical examination, he exhibited a slight reduction in left arm strength and a positive Spurling's maneuver on the left. (*Id*.)  Dr. Kulkarni assigned him a diagnosis of cervical disk herniation and prescribed methadone. (*Id*.)  Later that month, White reported to Dr. Kulkarni that his neck pain was substantially improved, that he was eighty percent better, and that he no longer had any significant arm pain. (Tr. 365.)  He also stated that he was working four hours a day and that he had no side effects from the methadone. (*Id*.)  An examination revealed an improved range of motion in his neck, full range of motion in his upper extremities, a negative Spurling's test, normal strength, and normal reflexes. (*Id*.)  White told Dr. Kulkarni that he was doing "extremely well with the medication" and was able "to work with the pain under control." (*Id*.) In January 2005, White again visited Dr. Kulkarni and reported that his neck pain was "well controlled" with his medication. (Tr. 361.)  He stated that he occasionally experienced left arm numbness but had no weakness and was "able to work." (*Id*.)

In February 2005, White followed-up with Dr. Shah. (Tr. 291.)  An examination revealed decreased reflexes, a slow gait, and left-sided hemianopia. (*Id*.)  He adjusted White's medication. (*Id*.)

From February through September 2005, White occasionally visited Dr. Charles Coats,

his family practitioner, who reported that White had normal musculoskeletal and neurological findings during each of the examinations. (Tr. 283-86.)  In addition, White visited the emergency room in May and June 2005 for complaints of right knee pain and leg swelling. (Tr. 288, 394.) Also, White underwent an MRI of his left shoulder in October 2005, which revealed a questionable or partial tear of the labral complex but no tear in the rotator cuff. (Tr. 255.)

In November 2005, Dr. Charles Coats completed a Medical Source Statement on White's behalf. (Tr. 269-72.)  Dr. Coats noted that White had severe cervical stenosis with degenerative disk disease and degenerative joint disease, hypertension, and diabetes. (*Id*.)  He identified clinical and objective findings as a limited range of motion with the lumbar and cervical spine, an MRI showing degenerative disk disease of his cervical spine, and tenderness to palpation of the cervical spine; he represented White's symptoms as neck pain, muscle spasms, bilateral shoulder pain, lower back pain, leg cramps, and numbness in his hands and feet. (*Id*.)  Dr. Coats opined that White could sit for fifteen minutes at a time and for a total of less than two hours in an eight-hour workday, stand for fifteen minutes at a time, stand/walk for a total of less than two hours in an eight-hour workday, rarely lift less than ten pounds, and work "less than 1 hour" in an entire week. (*Id*.)  Dr. Coats explained that White's chronic neck and back pain made it difficult for him to engage in gainful employment. (*Id*.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

15

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

  To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

  Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

  The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[8] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B.  The ALJ's Decision

On January 12, 2006, the ALJ rendered his opinion. (Tr. 24-36.)  He found at step one of the five-step analysis that White had not engaged in substantial gainful activity since his alleged onset date of May 12, 2001, and at step two that White's degenerative joint disease, Type II insulin dependent diabetes mellitus, essential hypertension, osteoarthrosis, lower back pain, organic mental disorder, and depression were severe impairments. (*Id.*)  At step three, he determined that White's impairment or combination of impairments were not severe enough to meet a listing. (*Id.*)  Before proceeding to step four, the ALJ determined that White's testimony of debilitating limitations was not entirely credible and that he had the RFC to perform "light unskilled work activity that is limited to simple, routine, repetitive tasks with no required

---

[8] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

production rate or pace, but rather goal-oriented work." (*Id*.)  Based on this RFC and the

vocational expert's testimony, the ALJ concluded at step four that White could perform his past

relevant work as a housekeeping cleaner and survey worker, as well as a significant number of

other jobs within the national economy. (*Id*.)  Therefore, White's claims for DIB and SSI were

denied. (*Id*.)

### C.  The ALJ's Credibility Determination Fails to Build an Accurate and Logical Bridge Between the Evidence and the Result

In pursuit of a remand, White contends that the ALJ improperly discounted his

credibility, arguing that "the ALJ's review of the evidence [was] selective." (Opening Br. at 21.)

Ultimately, White's attack on the ALJ's credibility analysis has merit.

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000).  If an ALJ's determination is grounded in the record and articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at

435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's

credibility determination because the ALJ's decision was based on "serious errors in reasoning

rather than merely the demeanor of the witness . . . . ").

In this instance, the ALJ made the following credibility determination:

> The claimant's testimony is not found to be fully credible, as it was not supported
> by the objective medical evidence of record, nor by his treatment history.  The
> claimant's allegation that a visual deficit precludes sustained full-time gainful

> work activity is not supported by the evidence.  Further, the claimant's testimony that he has problems with the use of his hands, which results in related limitations, is not supported by the objective medical evidence of record, or by his treatment history (Examination on April 26, 2004, reflects good distal grip strength).  Testimony that is not consistent with or supported by the medical evidence of record is not entitled to weight.

(Tr. 32.)  White contends that the ALJ failed to fairly evaluate the evidence when rendering this credibility determination in that the ALJ turned a blind eye to evidence that contradicted his conclusion.  More specifically, White contends, among other things, that the ALJ ignored evidence that validated his testimony that he had problems with the use of his upper extremities.  In support of his argument, White points to Dr. Holton's examination findings that reflect he was unable to manipulate a zipper or pick up coins with either hand, that he had reduced grip strength in both hands, and that he had decreased left thenar eminence sensation.

Indeed, Dr. Holton's examination, as well as the examinations of Dr. Williams, Dr. Shah, and Dr. Akel, documented that White had decreased grip strength, upper extremity weakness, or diminished upper extremity sensation. (*See* Tr. 432-33, 435, 439-440, 533-35, 1018-19.)  The ALJ, however, failed to address this evidence in his decision, instead selectively citing a note from an April 2004 emergency room visit that indicated White had "good distal grip strength." (*See* Tr. 32.)  While indeed some of the medical evidence of record does indeed suggest the opposite – that is, that White does not have upper extremity deficits, the ALJ should not have ignored the medical evidence that supports White's claim, which, as noted *supra,* is somewhat plentiful throughout the record.  "The [Commissioner] may not select only that evidence that favors his ultimate conclusion; rather, he must articulate at some minimal level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position." *Stein v. Sullivan*, 892 F.2d 43, 47 (7th Cir. 1989); *see also Nelson v. Apfel*, 131 F.3d

1228, (7th Cir. 1997) ("The [Commissioner's] decision must be based on consideration of all relevant evidence and the reason for his conclusion must be stated in a manner sufficient to permit an informed review."); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995) ("[I]n cases where the claimant presents considerable proof to counter the agency's position, the ALJ must articulate, at some minimum level, his analysis of the evidence."); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

Moreover, the remainder of the ALJ's credibility determination is deficient because the ALJ's explanation lacks the detail necessary to enable the Court to trace the ALJ's path of reasoning. *See Schmidt*, 395 F.3d at 746-47 (noting that an ALJ is required to "articulate specific reasons for discounting a claimant's testimony as being less than credible"); *Clifford*, 227 F.3d at 871-72 (remanding the ALJ's credibility determination because the ALJ failed to explain why the objective medical evidence did not support the claimant's allegations of disabling pain). Here, the ALJ opined that White's allegations regarding his limitations are "not supported by the objective medical evidence of record, nor by his treatment history"; however, the ALJ failed to cite to specific objective medical evidence or his treatment history in the record to support his conclusion, other than the April 2004 evidence concerning White's grip strength. (*See* Tr. 32.) Therefore, the Court is unable to determine on what specific evidence the ALJ relied to reach his

conclusion.[9] *See Wirth v. Barnhart*, 318 F. Supp. 2d 726, 743-44 (E.D. Wis. 2004) (remanding social security appeal when the ALJ made a conclusory statement that "the absence of medical evidence supporting the allegations of severe pain . . . further erode the claimant's credibility . . .").

Admittedly, as the Commissioner emphasizes in its response brief, other evidence of record suggests that White's testimony of debilitating limitations may well be less than credible. (*See* Mem. in Supp. of the Commissioner's Decision at 24-25 (advancing numerous *post hoc* arguments in support of the Commissioner's decision)).  Nonetheless, the Court must confine its review to those reasons articulated by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *Steele*, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").  In a nutshell, "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision." *Mirza v. Barnhart*, No. 00 C 8003, 2002

---

[9] While the Court acknowledges that the ALJ's credibility determination is supported by his observation that the record lacks documentation of "a visual deficit [that] precludes sustained full-time gainful work activity," this statement standing alone seemingly fails to build an accurate and logical bridge between the evidence and the result, *see Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002), as White's visual deficit is just one of several impairments that he claims *in combination* contribute to his alleged disability.

WL 731781, at *7 (N.D. Ill. Apr. 25, 2002).

Here, the bridge built by the ALJ between the evidence and the credibility determination is not an accurate and logical one, since he ignored significant evidence that contradicted his conclusion and failed to connect his credibility determination to other specific evidence of record that would support his outcome. *See generally Ribaudo*, 458 F.3d at 584; *Steele*, 290 F.3d at 941, *Dixon*, 270 F.3d at 1176. Therefore, the ALJ's credibility determination will be remanded to the Commissioner for further consideration.[10] *See generally Clifford*, 227 F.3d at 869 (emphasizing that it is inappropriate for the Court to re-weigh the evidence, resolve conflicts in the record, or decide questions of credibility).

### D.  The ALJ Failed to Properly Consider the Opinion of Dr. Zolman

White also contends that the ALJ erred by failing to properly consider the opinion of Dr. Zolman, his treating physiatrist, who assigned him permanent restrictions that limit him to lifting, carrying, pushing, and pulling no more than one pound and only occasionally sitting, standing, walking, stooping, bending, and balancing. Indeed, White's argument is persuasive, as

---

[10] On remand of the credibility analysis, the ALJ is encouraged to explore the following factors, in addition to the objective medical evidence and White's daily activities:

[1.] The location, duration, frequency, and intensity of the individual's pain or other symptoms;
[2.] Factors that precipitate and aggravate the symptoms;
[3.] The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
[4.] Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
[5.] Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board);
[6.] Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p. Although the ALJ is not required to "analyze or elaborate on each of [these] factors," he should "discuss most of the factors and connect them to the credibility determination." *Wirth*, 318 F. Supp. 2d at 743.

the ALJ failed to adequately address Dr. Zolman's opinion about what White could still do despite his impairments.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors used to determine the weight given to any medical opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB or SSI simply because his treating physician states that he is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon*, 270 F.3d at 1177.  The Commissioner, not a doctor selected by a patient to treat him, decides whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  Regardless of the outcome, the

23

Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, White contends that the ALJ erred by failing to discuss the permanent restrictions assigned to him by Dr. Zolman. Indeed, the ALJ failed to mention the permanent restrictions proffered by Dr. Zolman on August 7, 2002, or, for that matter, any of the temporary restrictions assigned by Dr. Zolman. *See* SSR 96-5p (stating that though treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, these opinions "must never be ignored"); *see also Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006). In fact, the ALJ only briefly referenced Dr. Zolman (incorrectly referring to him as an "orthopaedic specialist" rather than a physiatrist), mentioning only that he stated in two progress notes that White's limitations "did not seem to affect his activities of daily living." (Tr. 33.)

In response, the Commissioner argues that the ALJ did not ignore Dr. Zolman's August 7, 2002, restrictions because he discussed the results of the FCE upon which Dr. Zolman stated that his restrictions were based.[11]  While certainly an ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citation omitted), a reviewing court must be "able to trace the ALJ's path of reasoning." *Clifford*, 227 F.3d at 873. Here, the Court is forced to speculate whether the ALJ failed to consider Dr. Zolman's adoption of the permanent restrictions at all, or whether the ALJ considered and rejected them because Dr. Zolman stated that he recommended permanent

---

[11] The ALJ rejected the results of the FCE, stating that "[s]ince the date of that evaluation, the record appears to show some medical improvement in the claimant's capacity to function . . . ." (Tr. 32.)

restrictions "based upon the [FCE]." (Tr. 770); *see Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered). "[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." *Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) (citation omitted).

Moreover, once the ALJ determined that Dr. Zolman's opinion was not entitled to controlling weight, the ALJ erred by failing to analyze it with respect to the relevant factors in 20 C.F.R. § 404.1527(d), articulated *supra*, to assign the opinion an appropriate weight. *See* SSR 96-5p ("In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ."); *see generally Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992); *McGraw v. Apfel*, 87 F. Supp. 2d 845, 856 (N.D. Ind. 1999). The ALJ's wholesale discarding of a treating physician's opinion in this manner constitutes legal error and serves as additional basis for a remand.

Consequently, the Commissioner's final decision will be remanded for additional consideration of Dr. Zolman's opinion and for re-examination of White's credibility.[12]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the decision is REMANDED to the Commissioner for further proceedings in accordance with

---

[12] While the Court did not ultimately need to reach White's argument that the ALJ improperly evaluated whether White met the listing for mental retardation, Listing 12.05C, we note that the ALJ did not mention Listing 12.05C in his step three analysis even though Dr. Von Bargen specifically assigned White a diagnosis of mental retardation. (*See* Tr. 30.) Therefore, upon remand the ALJ is encouraged to explicitly address Listing 12.05 in his step three analysis and, if necessary, resolve the conflict (discussed *supra* in footnote 4) concerning White's educational background. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (stating that an ALJ's failure to mention the specific listing he is considering, if combined with a "perfunctory analysis," may necessitate a remand).

this Opinion.  The Clerk is directed to enter a judgment in favor of White and against the

Commissioner.

SO ORDERED.

Enter for this 25th day of September, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge